Alright, our next case for the day is Jones and Simmons v. Alfa Mutual Insurance Company. We're going to give the courtroom just a moment to settle down and then we'll begin. I want to make sure we have everybody's full attention first. Yes, Your Honor. Alright, Mr. Jackson, you may begin. Good morning. May it please the Court. And can I ask you to pull the microphone a little closer to you, please? Thank you so much. Is that better? Much better. Thank you. Thank you. May it please the Court. I'm Sidney Jackson and I represent the appellants in this case, Ms. Bobbie Simmons and Ms. Tina Jones. We're here because the lower court granted summary judgment to the defendant's alpha on this case and essentially kicked the case out of court. However, we assert that the court applied incorrect standards when it was doing this Rule 56 standard on the motions for summary judgment before it. Specifically, I'm going to talk about the ADEA claims and my colleague, Mr. David Martin, will talk about the ERISA claims when my time is over. As it relates to the ADEA discrimination claim, the lower court did a credibility determination when it gave the credit to the decision maker, Mr. Rex Seabrook, specifically his subjective reasons for ranking the plaintiffs in this case at a lower rank so that they would be terminated. However, the record is entirely devoid of any evidence to support the subjective reasonings that he provided to the court. Specifically, there is no evidence in the record that Ms. Simmons, whom he stated was unkind, and that was his reason for ranking her at the lower totem to be terminated. There's also no evidence in the record to state that Mrs. Jones was a poor communicator. These two individuals worked for the company for over 30 years. Nowhere in their performance records is that the case. They were never discredited for being unkind or having poor communication skills. Rather, just the opposite, they either met or exceeded expectations for each of the 30 years that they worked there. In fact, the corporate representative for Alpha during the deposition, who is also the employee relations manager, testified that performance was not an issue with the plaintiffs. So it directly contradicted Mr. Seabrook's subjective reasoning. They said that the two plaintiffs never had any issues, they were good employees, and they didn't do anything to be terminated. Performance wasn't an issue at all. However, Mr. Seabrook came up with this subjective reasoning during the deposition, and it was the first time that we heard of it. Again, nothing in the record supports what Mr. Seabrook said. Weren't those two reasons that he offered in relation to only the open spot, I guess the transfer spot, that Ms. Betts was recommended for but didn't accept? That's correct. He recommended that, well, he recommended to his boss that the two plaintiffs also were qualified for that position. However, he never presented their names to the decision maker for that particular job. He only presented Ms. Betts for that particular position, which ultimately she didn't take, which left that position open. It was the APS representative position, which was in the life department. One of our clients, Ms. Simmons, had 13 years of experience in the life department. In fact, she did so well in the life department that she was promoted to the underwriting position that she currently held. However, he never gave her that opportunity to present her name to the decision maker for it. Instead, he only presented Pam Betts, who was the 35-year-old. Did Ms. Simmons apply for any open positions? The positions weren't made available for her to apply to. In fact, during the termination meeting, she asked Mr. Seabrook, were there any other positions I could go to? Is there anything I could do? I've worked at the company for 34 years. I'm about to hit this rule of 90 benefit. Is there anything that I can do? He said, well, you can apply for an open position if it becomes available. However, he didn't inform her that that APS representative position was available. Did she look for any open positions? She did not look for any open positions because she felt as though she was discriminated against. As you know from the record, she believed that she had been being discriminated against for quite some time and had been complaining that she felt that age was a reason for her  This had pretty much destroyed her. Again, she had been working for this company since she was 19 years old in 1985. She felt as though the company completely turned its back on her and then started showing more favoritism to this younger underwriter who had far less experience than her, far less qualifications. So she felt completely disheartened to even attempt to try to get another job. It seems, though, that a lot of the individuals, to the extent she's arguing similarly situated, are within the same age range. I mean, I thought the ADA is about 40 and over, and almost all of these individuals are above 40. There were three other individuals. However, a very important distinction is there, and that is Ms. Simmons was approaching the rule of 90 benefit, where you have to take her age plus the amount of seniority that she had with the company. If you combine those two and it equals 90, then she gets this great pension benefit. And that's the ERISA claim. That's the ERISA claim that your colleague said. That's part of the ERISA claim, but it's also something that helped determine why they targeted her for this treatment that she experienced. Because ultimately, the decision-maker, Mr. Seabrook, was tasked with cutting expenses as much as possible for the field services unit. So it's age discrimination, though, if other people who are within the age range aren't targeted, even if she was assumed for purposes of this question that she was targeted because of the retirement benefits she was about to get. Doesn't that show that they were really discriminating on the basis of those retirement benefits, not on age, if the other people who hadn't been at the company as long, but were also older, were not discriminated against? Well, I don't think that's the case, because in Ballstick, of course, you can have multiple but-for reasons. And with this rule of 90 benefit, you have to consider the age of the person, and they have to be over a certain age to be considered. And you also have to consider the seniority. Under Ballstick, if you have multiple but-for causes, you can consider that discrimination, which is the case that we have here. All right. Thank you very much, Mr. Jackson. You've reserved five minutes for rebuttal. We'll hear from Mr. Martin now. May it please the Court. I'm David Martin, and I'm also representing the plaintiffs. I am discussing the Arrest of Section 510 case. Basically, we have another situation where the McDonnell-Douglas case has yet confused another district court. And basically, what we have is a case where the district court correctly ruled that we met our prima facie case that the plaintiffs were protected because they were participants in a pension, they were qualified for other positions, and they suffered indifference of discrimination. So the elements were met, basically. Under the Seaman case, any inference of discrimination is adequate. Any meaning that's a mixed motive standard. And the district court was confused and even cited Seaman in the any motive standard, but then went further and said, but you needed to also prove pretext. And I don't think you did enough to prove pretext. Well, we know from the Quigg case that that's not necessary in a mixed motive case. Because under Quigg . . . Well, let me stop you for a second. Sure. What do we do with Gross? I mean, Gross, the Supreme Court case that talks about how mixed motive versus but-for causation applies in Title VII, but that's because Congress expressly amended that statute to incorporate that standard. And we don't . . . do we have that in ERISA? In ERISA, we have the any inference of discrimination standard, which may be broader than a motivating factor standard. So, Congress, as noted in Quigg, did dislike what the Supreme Court had done in Price-Waterhouse and determined that it would change the standard from single motive to any motivating factor. And I believe that this Court has consistently utilized the any motivating factor standard and the any inference of discrimination standard as both constituting mixed motive. And, in fact, there's indications of that with the Clark case. Now, the defendants rely heavily on Clark. That's true, but the Clark case is also years before we have Gross. I mean, you might be right. I'm just . . . that's why I'm asking you about it. Well, Clark just demonstrates that the Court is looking at mixed motive with an ERISA claim. And that has always been the case, that the Eleventh Circuit has considered that to be a mixed motive standard. It has to be, because if you have any inference of discrimination, obviously, you can have two different reasons for there being an inference of discrimination. But if one of them is because I want to also cut pension costs, I want to also cut pension participation, that runs afoul. Did a Clark apply . . . So, yes, the District Court applied McDonnell-Douglas, but it also applied the convincing mosaic test. And we actually issued a published decision, Ishmael v. Roundtree, which I think does a good job of defining the convincing mosaic test. So why isn't the convincing mosaic test enough for you to get over this evidentiary hump? And does that test, as you understand it, incorporate some of the mixed motive analysis? Well, mixed mosaic is broader than McDonnell-Douglas, as your panel pointed out in the Ishmael case. And so the convincing mosaic is fine to utilize as long as you don't push us into adding, with an ERISA claim, adding an extra element. When you have a mixed motive element, what the Quig Court said was we've adopted the white standard from, I believe it was the Sixth Circuit. And basically, under that standard, you can use either direct evidence or inferences. The convincing mosaic standard. And I think we did have enough evidence to demonstrate, nonetheless, that, first of all, Mr. Seabrook directly said I'm cutting pensions, benefits, and salary. I'm looking for the best cost savings. He directly said that's direct evidence. That doesn't require an inference. And then Seabrook also stated that he knew, and I see my time is up, so I'll conclude with this comment. He knew that pensions each year that you served would be more, that would cost more. Thank you. Question, Judge Rosenbaum. Let's say that we do not think that the mixed motive standard is appropriate. Do you have an argument that even under a single motive standard, your clients can be successful? Well, I do. I think it would run afoul of the statute, but I do have an argument for that. If it runs afoul of the statute, probably not, but go ahead. Right, okay. But I'd love to hear it. The argument is that even if we're just looking at inferences only alone and looking for a single motive, we had enough for a question of fact for a jury to at least decide the matter or for the court to decide the matter with the trial. And so, first of all, Segrist testified that he knew that pensions were going to cost more each year that he served. We also know that Alpha was dumping $30 million a year into its pension because it had been underfunded. Seabrook knew that the pension was frozen. So we also understood that. We also know that Seabrook reported to Beth Chancy, and he reported to Tommy Koshat. And Tommy Koshat sat on the pension committee, and Beth Chancy also understood the expense of the pension. And she understood the very, very nitty-gritty details of who Seabrook was targeting. So we have at least a question of fact on those issues. You think that probably they knew and that the evidence that they were—I guess if you're moving under a mixed motive framework, you're saying that the evidence of the kind of legal reason would be that they were poor performers? Is that your mixed motive theory? Because I thought the argument was that they were not poor performers. So what's the legal motive in your theory? That's what I'm trying to— They were not—you were correct, Your Honor. They were not poor performers. They had satisfactory performance reviews. And the individual that got the job or was available, that Seabrook wanted to push for the job, Ms. Betts, she actually had some derogatory performance reviews. Right, but that's why I'm wondering. I'm trying to understand why you're relying on mixed motive, because mixed motive means there was— even let's suppose that it could be mixed motive. It means there was a legal reason for the action and an illegal reason. I'm hearing you say the illegal reason is to save on pension payouts, but I'm not hearing any concession about what the legal reason would have been. So it sounds like you're traveling under a single motive framework anyway, but what am I missing? Oh, well, I'm not—I'm saying that there are multiple reasons, and I didn't have to go so far under the mixed motive standard. But if I'm going under a single motive standard— No, no, no. I'm trying to understand, since you're pushing for a mixed motive, what the various reasons that you're saying that they had were. I know you're saying that they had a desire to save on pension plans, right? Right. What else? What else? What are you saying were the other reasons? Okay, well, they desired to save on pension plans, but these people were close to maxing out on what's called the Rule of 90 benefit. Right. That's the pension plan reason, so I'm trying to find out what other reasons there were. Or are you just saying that's the one reason? Well, that is the main reason from my perspective that these individuals— well, let me explain it this way. There's the decision to downsize, okay? Then there's the decision on who is going to get shuffled and who isn't. Our two clients were the only ones that did not get shuffled, okay? And they were the ones that were close to maxing out with their pensions. Right, I understand that. All right. So are you just saying—let me just see if I can get this. Maybe you're saying that there are two different things you could be saying. One is there was only one reason. It was the ERISA benefits. But in the alternative, even if you want to accept that they were poor performers, which we say they were not, then we go to mixed motive. Is that what you're saying? Yes. Okay. I'm arguing that's in the alternative. Okay. Yeah. Second, let me ask you a question because with respect to the mixed motive argument, which specific text in which specific statutory provision do you rely on to show that Congress created a mixed motive cause of action like it did in Title VII? 29 U.S.C. Section 1140 says it shall be unlawful for any person to discharge, any participant or beneficiary, for exercising any right. And the Seaman case discussed that any right standard and said that you can have, you know, multiple reasons, but you don't have to show that the effort to discriminate on the pension is the sole reason for the discharge. There could be a permissible reason such as downsizing or we don't think they're as qualified, but you don't have to show it.  Maybe I missed it. I thought Judge Rosenbaum's question was about the statutory provision that supports your argument that a mixed motive standard applies. Did you cite to one? 1140, Section 5. Okay. It uses the word any, and the Seaman case interpreted any to mean any. It can be multiple motives for the reason for somebody to be terminated. But you can still have multiple motives in a but-for causation case. You just have to show that the motive that you're relying on was one of the but-for causes. So, I mean, I'm trying to understand whether there's some difference here between but-for causation, whether we're really talking about anything different than but-for causation here. I don't think it needs to be sole but-for. What I'm trying to let you know is when it looked like there was an opportunity to place the plaintiffs in another position, they didn't want to lose the savings that they already had obtained by terminating the plaintiffs, given that they were long-term employees with reasonable wages and almost ready to max out on the Rule of 90 pension benefit, meaning they get a full normal retirement benefit 10 years before age 65. They would get it at age 55. All right. Thank you very much. Thank you. You've reserved two minutes, and we're going to hear next from counsel for Alpha Mutual Insurance Company. We took counsel on the other side over by about seven minutes, so we're going to give you an extra seven minutes. You are under no obligation to use all that time. Thank you, Your Honor. Hopefully I will not need to. May it please the Court. Can you hear me okay? Yes. Thank you. May it please the Court. My name is Yvonne Madalena, and I represent Alpha Mutual Insurance Company. In this case, it does not matter which standard of proof is utilized to establish causation in this case. The district court's opinion on all claims where they granted summary judgment should be withheld because the plaintiffs failed to put forth evidence that's sufficient for a jury to find discrimination or retaliation or interference with the ERISA rights. I appreciate that, but what standard of review do you believe is appropriate or legal standard do you believe is appropriate? For which claim? Well, I guess we started out maybe with— Yeah, I was going to address your question, and you had asked if a convincing mosaic was not enough to get over the burden on the ERISA claim. The ERISA claim is a single motive claim. All the cases that have ever addressed this have used McDonnell Douglas. They've used that prima facie case and then a non-interference reason and then establishing pretext. The problem that arises here is all of those cases also in establishing what a prima facie case is, the third factor there is that the plaintiffs were discharged under circumstances that give rise to an inference of discrimination. In that description, particularly in Clark, which is relied upon by most of the later cases, in analyzing whether or not there's instances or evidence to give rise to an inference of discrimination, the confusion has come out because they then said a plaintiff must show that the evidence of interference was a motivating factor. So the case law itself uses the McDonnell Douglas standard, but in doing so, in that prima facie case, it also discusses motivating factor. For an ERISA case, really, it doesn't matter what you call the standard. All of the cases say that for ERISA, what the — and the wording is, the ultimate inquiry in a Section 510 case is whether or not the employer had the specific intent to interfere with that employee's ERISA rights. In other words, the plaintiffs must introduce evidence that suggests the decision was directed at the ERISA rights of those plaintiffs in particular. And there is no evidence whatsoever that any decision maker in this case looked at the pension benefits of either Ms. Jones or Ms. Simmons in making a decision to not move them to any other position. Let me ask you a question about that. The employee numbers, are those in, like, chronological order? In other words, the employees who come into the company earliest, do they have the lowest numbers? Yes.  So when you all received a chart with the employee numbers, it would have been clear who, I mean, when you look at that and then you know who the people are, it seems like it might have been clear who was going to be eligible for the biggest pensions soonest, wouldn't it? Well, again, that would require speculation because what that would require is several steps of speculation. It would require that Mr. Seabrook looked at the years of service and looked at the age and made a calculation, and that is what they're asserting, that he did that. If he did that, he had to do that for every one of those employees. Well, not really. He could look at the ones that were the lowest, right, the lowest numbers, and say, okay, well, let's just get rid of the lowest numbers. Right. So he's going to look at two people. Look at those two factors. Ms. Jones is 49. Ms. Simmons is 54. There are two employees that are older than Ms. Jones, Ms. Everidge, who is 51, Ms. Perkins, who is 54. Right, and that gets you to 88. Right. Look at the years of service. Then he has to know whether or not they were planned participants. There were two other people who were also planned participants. Ms. Knowles and Ms. Perkins were planned participants. What were their employee numbers in comparison to Simmons and Jones? I'm not certain what their employee numbers were. I think they were higher. But also what he would have to do is not just know those numbers of service and how much higher. Just because there's an employee number and it's higher, all that means is all the employees within the company. So maybe one year they hired 1,000 employees, and the next year they only hired 100 employees. The year difference, you see what I'm saying? There could be a very marked difference. How many employees does the company have, roughly? Over 1,000. I mean, it's a large organization in multiple states. And in this reorg, am I correct in understanding that two people were let go? Yes, Your Honor. In this organization, there were six assistant underwriters. Four of them were let go. Three out of four of those were over the age of 40. The two that were let go were Ms. Jones and Ms. Simmons. You can see how, at least, it might seem that an organizational overhaul that ends up only losing two people is not that much of an overhaul. Well, that was just with this department. Every department was undergoing, every department had been instructed to cut costs everywhere that they could. That's how this came up. Did other departments also end up having people depart?  Do you know how many? I do not know company-wide because we focused on the field services department because that was the department in which the plaintiffs worked. There were other people in the field services department. If Your Honors looked at, in the record, document 65-22, that lists all of the field service employees. It lists their ages. It lists their employee numbers, their names. In that, it will show, with regard to the age claim, there were only three employees that weren't over the age of 40. People tend to stay with Alpha unless there's something like a reduction in force that chooses this decision. If I can go back to the decision that they're saying that had to be made, Mr. Sechrist would have had to have made and had an understanding of the years of service and the age of all of those employees that are being considered. They argue that he made, he didn't have to have a specific number. He could make a ballpark estimate. But if he makes that ballpark estimate, he has to make that ballpark estimate for everyone. For instance, Ms. Knowles is two years younger than Ms. Jones. She's also a planned participant. If we're looking at savings, if she's a planned participant and she's 47 years old, he's going to have to know her exact hire date. Why is that? Go ahead. Not really, because Ms. Knowles' number is 18663, and Ms. Jones' number is 14125. So regardless of how old they are in comparison to each other, we know that Ms. Jones, assuming she's a member of the plan, is going to have more time in than Ms. Knowles, don't we? She is going to have more time in, but I can't look at that chart and say how much more time she had. I can't look at that chart and determine, or any evidence that's in the record, any of the emails that they cite, the charts that are there. There's not a calculation of how many years of service. You can know that someone's been there longer, but you can't know the exact number of their years of service. And without that calculation, you can't even make a ballpark estimate. But assume he makes a ballpark estimate. He makes a ballpark estimate. Again, there are other employees. If I can just say, Ms. Knowles, she's two years younger and she's on the plan. Their argument is that Ms. Jones would have had another five or six years, and so he's making a decision now to cut off her ERISA benefits. Ms. Knowles would have worked for another two years past that. So, again, there's nothing— Maybe, but if you take Ms. Simmons, Ms. Simmons was like 18 months out, right? Yes, Ms. Simmons was, but again— And her number starts with 1100, right? It is. As opposed to 18. If we—that is true, that is true. But look at the—they're asking you to speculate. That is what the district opinion focused on, is that they're requiring speculation, not evidence. Well, why is that not a reasonable inference, which would be proper for a jury? My challenge here is that, you know, it's the dismissal at a summary judgment stage. Even everything that you just recited raises questions that are relevant for purposes of determining whether or not, you know, at least on the ERISA claim, I can hear you on the ADEA claim because of the age cohort. But why is this not proper evidence to present before a jury? Because it's still not evidence. It's still speculation. What the evidence actually shows is Mr. Siegbrook testified under oath. He did not obtain any information from HR on demographics or benefits or whether anyone was a planned participant. Mr. Cheney testified that—Ms. Cheney testified and denied that years of service are ever considered in any decision to cut costs, to eliminate pensions, or who to transfer to other positions. So can I ask you, is there any evidence in the record that explains why it is that employee ID, name, gender, race, ethnic group, DOB, title, proposed date of reorganization, decisional unit, blah, blah, blah, everything that's in that chart, why did they need that when they were making the decisions, including the employee number? I do not believe there's anything in the record. I can state that many companies, such as Alpha, when they are doing reductions in force, those categories are looked at to make sure there's not an adverse impact, not just adverse treatment, but adverse impact on any particular protected category. So if— Can we, I mean, can we consider that given that there seems to be nothing in the record that explains why it's in there? I believe this Court, as the district court, is obligated to look at what is in the record. Right, and so on summary judgment, don't we have to draw all reasonable inferences in favor of the non-moving party? You absolutely do, but you're not supposed to speculate as to what those decisions would have or could have been. Right, but you guys moved for summary judgment, and you did not explain why that's in there. And it is a little bit, I mean, it is a little bit odd, right, that we've got this information with the employee numbers and everything, which, as we've already discussed, does sort of tip you off as to how long an employee has been there relative to another employee. It does tip you off, but again, knowing that—he could just know that himself, whether it's an employee ID or not. He could know Ms. Jones has been there longer than Ms. Betts or Ms. Perkins. And to be fair, wouldn't you assume that you would need the employee numbers in order to effectuate whatever decision you were going to effectuate, no matter who it was? Yes. Employee ID numbers are oftentimes identified with the employee names, so it's easy to track them later for anyone who's making any sort of entries. But I wonder, what evidence do we have to support the fact that they were the lowest performing employees besides Mr. Seabrook's deposition testimony? We have just Mr. Seabrook's testimony. Again, there's not a problem with their performance in general. If there had not been a reduction in force, these two women would not have lost their positions. You're not going to—they're right. You're not going to look at their personnel files and find that they had poor performance. That's not what the testimony was. The testimony was, everyone had good performance. But when we have six individuals and there are people that we're going to need to let go to cut costs, Mr. Seabrook performed a subjective opinion. Now, he did not— But it just happened to result in the people who were eligible for the highest amount of pension. I mean, and you acknowledge that even if we look at this through a convincing mosaic lens, all of the questions that have been raised, I don't—again, I don't see how that doesn't get the plaintiff at least over the hump in terms of the summary judgment standard. Well, Your Honor, again, going back to the point I was going to make with Judge Grant, number one, those personnel files and those performance reviews were not done by Mr. Seabrook. Mr. Seabrook is two levels above them. So he didn't have input into those. He does have a right when he's looking at weighing which employees are better than the other to use his own subjective judgment. He had interviewed Ms. Jones before. He had talked to other people about Ms. Simmons' reputation amongst others. He had talked to their past and present supervisors. And he took all that into account. But we don't have the testimony of any of those people, right? No, we have his testimony that he talked about. And there were some negative things in Ms. Betz's file, correct? There were. But also Ms. Betz, they talk about comparing qualifications. Ms. Betz also had a college degree that was not held by the plaintiffs. If I can go back to the point there, every company wants their employees to be good employees, to meet standards, and all six of those assistant underwriters met standards. But when you have a reduction in force, they have to go in and then weigh, do some of these people have more suitable skills? It was a business judgment on behalf of Mr. Seabrook. There's nothing in the record to show that he had any discriminatory animus. There's nothing in the record to show that anybody in that chain had any discriminatory animus. There is evidence in the record to indicate that he did not get any information from HR on any of this, that Ms. Cheney stated that years of service has never been considered in any employment decisions. Mr. Koshet testified that he never knew the experience of an individual or what benefits they had. And he testified that cost savings, when they weighed them, are based on the averages. So, again, the district court focused on that evidence that was in the record and noted that the assumption that Mr. Seabrook had the evidence that he had, that he then used all that evidence to make a calculation, because he was a numbers person, as they put it, and then he used that information to utilize in his performance evaluations, is adding layers of speculation upon layers of speculation. What he testified to, what is in the record, what he said under oath is, I looked at my own experience, I looked at my conversations with other people. And they may bring up the experience was in the file and he didn't look at the file. Well, all that means is he's negligent. If he didn't look at the file, maybe he's a negligent boss. Maybe he's a jerk. But that doesn't mean that he made a decision that was based on an impermissible inference. It does not mean that he made a decision based on their age or their participation in the pension benefits. I'm technically out of my other time, but I was going to also, if there weren't any other questions, I was going to also address on the age claims that came up. Again, they had talked about Ms. Betts. There were two positions in which Ms. Betts was suggested. There was a like position, and Mr. Seabrook also recommended the plaintiffs. When asked for follow-up, and they specifically said, who do you think is the better communicator, he said, I think it's Ms. Betts. That was information he provided to his supervisor. That supervisor then provided it to someone else. Mr. Seabrook was not a decision maker for either of the jobs that were at issue. The other job he was asked for his opinion, he said, I think Ms. Betts would be best on that. Again, no discriminatory animus stated there, nothing for another decision maker to look at to say, oh, he's saying that because she's younger. Or, oh, he's saying that because she's not a plaintiff participant. So those are the facts that actually occurred in a case where the company is dealing with a reduction in force and trying to let go several other people. Again, there were only two assistant underwriters, but there were other people additionally in the field services department that were let go as well. Also, they bring up that Mr. Seabrook said he was weighing salaries and benefits. Number one, benefits, as you all would know, I've had cases before you before, benefits include other things besides your pension plan. They can include your health insurance. They can include your disability insurance. Right, except that given the length of service that we're talking about, for example, for Ms. Jones, I guess it is, wouldn't that be, I mean, wasn't she up for like one point over a million dollars in her pension or something to that number? She was young enough and had so many years left. I think her claim is the one that has the higher dollar amount. So wouldn't that obviously be the most significant component of the benefits by far for her? For her it would be. For every other employee, nobody could testify to that. There are other employees that perhaps their health insurance costs are very, very high, and it would be argued that what the company pays out for health insurance for them is more. What my point is is not to get into that. My point is that to get into that is speculation. The point I'm trying to make is the testimony is that he looked at salary and benefits, and benefits is a lot more than just a pension plan. Right, but he did consider benefits. He says he considers salary and benefits, but the testimony also showed that he didn't consider individual people's salary and benefits. He considered an average, and that's in the record. How do you consider salary and benefits if you're considering only an average? What does that mean? It means they look at, you know, roughly an assistant underwriter earns roughly this amount of money, and the company usually pays 30 percent or 20 percent. We don't have evidence as to the particular calculation, but we do have the testimony of Mr. Koshat in his deposition who specifically says that averages were utilized, and I would draw your attention to that because it is cited repeatedly in their briefing. If you would look at his deposition, it's 59-39, and if you would look at pages 32 to 33 of that because I believe what he's testifying in there is very clear that he did not look at individual salaries or benefits. He's not aware of anybody under him who's ever looked at salary and benefits for an individual, that they always look at just an average cost when they're making determinations. But wouldn't it be important to know what the average was? Like, were they looking at the average salary and benefits for a specific type of position, for a person who had been an employee for a certain number of years, for a person in a particular department? Is there any evidence about what it was, the average that they were looking at? I don't believe that there's specific instances as to the dollar amount that they utilized, and I do not have a page site for you, but I do believe Mr. Koshat, near the pages or on the pages I cited to you, does discuss that they look at the averages for that unit or that position. Do you know if there were any document requests from the other side for these documents outlining the averages and things like that that they looked at? I can tell you that there were no disputes with our responses to those discovery requests that affected this. I'm not sure of all of the requests for production because I think there were over 30. Okay. All right, thank you very much, Ms. Madalena. Thank you for your time. We will hear from Mr. Jackson. You've reserved five minutes. I have a question before we get into your time related to that, which is if the contention is that they say they were looking at these averages, and that, I'll confess, seems a little bit odd to me too, but do you know if you all requested any documents related to what they looked at rather than just their testimony? We requested all documents related to the pension benefits and the amount of money that they were supposed to be or that they could be paid. Any documents related to their decision-making on how to work out these reductions in force issues? The documents, we actually have testimony from, I believe his name was Timothy Lavender, there that specifically states that really to figure out an average or an about amount related to these benefits, you only need to know the years of service, the age, and their salary. And with those three components of information, you should be able to figure out the averages from that. And there's no question that the decision-maker had all three of those. But they had those for everyone, right? And so I guess the average would be averaging all of those numbers for all of the people, correct? That's correct. Do you have any evidence that they did or didn't do that? Create the overall average as opposed to the individual calculations? We don't. I can't think of any evidence that Your Honor is speaking of at the moment. Okay. Thank you. I would like to point out that counsel stated that they don't, that Mr. Seabrook and the others have testified that they never used seniority in their calculations or their reasoning for the reductions that they made or decisions they made. However, if you look at Doc 6521, two weeks before the termination was done, Mr. Seabrook requested a document that had each of the plaintiff's names and the years of seniority that they had with the company. But wasn't that for purposes, I mean, there's no, let me know if I'm missing something, but it didn't seem like there was any evidence contradicting what it appeared to be, which was to provide or recognize years of service for those who had, I don't know if it was 30 or more years or whatever it was. That was the response that he gave when questioned about that document. However, that document was requested on October 9th. The decision to terminate them was on October, I'm sorry, October 2nd. The decision to terminate them was on October 19th. So those two, that temporal scope alone leads us to believe that he certainly looked at that and acknowledged the fact that the plaintiff's had X amount of years in seniority with the company. Is there any indication that they didn't, that they hadn't in the past recognized years of service? Well, they certainly didn't recognize our clients with years of service, even after he requested that seniority document. And there's no evidence to suggest that they have recognized people for years of service. So you're saying that they did not have any subsequent, like, you know, email congratulations to these people for their term of service or anything like that? That's correct. Okay. And I guess my confusion is, and the reason why I emphasized earlier that the age of the cohort is because it seems like the seniority issue would be maybe more helpful for the ERISA claim. And I'm trying to understand why in an age discrimination claim, which focuses on how old you are, we should be considering seniority. Right. So, again, he was tasked with cutting expenses. So based on that, he considered both their age and also the amount of benefits that they would have because that's how you get to the rule of 90 benefits, those two. You can't divorce the two alone.  No, and I understand that. But in terms of an age discrimination case, I'm trying to understand what is the, let's say, what is the legal support for why seniority should also be considered in this particular claim? And it might just be there's some case law I'm not aware of right now. No, that was strictly to show that they were targeted, you know, in the age discrimination claim, because not only for their age, but also for the amount of benefits that they had accrued because of their age. Well, because of their seniority. Because, again, they're people who were not affected, who were older, or at least in the same age range as they were. Right, but the two go hand in hand. In order to get to the rule of 90 benefit, you would have to have started working there at 20 years old. And most of all the other employees didn't start that early on. So you can't divorce the two. I didn't get an opportunity to talk about the ADEA retaliation claim. Well, it's too late now, sorry. Your opponent on the other side wouldn't have a chance to respond. And your time has run in any case. But we appreciate your presentation, and we'll hear next from Mr. Martin. Thank you. Your Honor, I would first of all like to say that you are correct that there's not a statute amending the risks of Section 510. We're traveling under the fact that the Seaman case said any means any, and it can be more than one reason. I'm sorry, not Ismail. I said, well, I did say Seaman. Under the recent Ismail case, it makes it rather clear that the McDonnell-Douglas standard is an evidentiary standard, and it doesn't have any role with a motion for summary judgment. It doesn't supplant Rule 56. And so our contention is that there are sufficient questions of fact in this situation that merit getting past summary judgment and at least resolving those questions of fact with a full trial. There's a lot of money at stake. Yes, but the other side is saying that you all aren't presenting reasonable inferences and disputes about that. You're moving fully on pure speculation. I don't think it's speculation when Seabrook says, yeah, I know that cutting pensions and terminating somebody, not cutting a pension, terminating somebody means they don't accrue any more years of service. So I know, yes, their pension is going to be less valuable. Okay, that's not speculation. That was his actual testimony. And it's not speculation also. But didn't he also say that they were doing it based on averages? Didn't he also say they were doing it based on averages? He said something like that, but his testimony wasn't entirely believable because there were documents in the record indicating where he said, this person is retiring and this is going to save us X number of dollars. And it was a rather precise figure and not a ballpark figure. They seem to have a problem with ballparks. Which specific records would you point to? Which specific documents in the record? I cannot point to the specific document, but it is in the appendix and it had to do with an individual who was retiring and he was calculating the exact savings that that individual would yield to the company. That indicated to me that his responses to some of these matters were not believable and deserved to be tested. Okay, thank you very much.  Thank you, counsel. We will be in adjournment.